UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMADA ORTEGA and MARCOS ARMAS, individually and on behalf of J.A.O., deceased,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; SINAI HEALTH SYSTEM, an Illinois not-for-profit corporation, doing business as MOUNT SINAI HOSPITAL; and MOUNT SINAI HOSPITAL MEDICAL CENTER OF CHICAGO, an Illinois not-for-profit corporation,<br><br>Defendants. | Case No. 16-cv-8402<br><br>Judge Martha M. Pacold |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Amada Ortega and Marcos Armas brought this medical malpractice lawsuit after their infant daughter, J.A.O., passed away from neuromuscular failure in 2013. Plaintiffs named as defendants the United States of America, which stands in place of two healthcare providers who were deemed to be federal employees, and Sinai Health System and Mount Sinai Hospital Medical Center of Chicago (the "Sinai defendants" or "Sinai"), which operate the hospital where J.A.O. was born. After several years of discovery, the United States and the Sinai defendants filed separate motions for summary judgment. [99], [102]. Because all evidence in the record indicates that J.A.O.'s neuromuscular failure was caused by a congenital condition rather than by negligence on the part of the healthcare providers, both motions are granted.

## BACKGROUND

**I.     Local Rule 56.1**

Local Rule 56.1 governs summary judgment briefing in the Northern District of Illinois. The Rule "is designed, in part, to aid the district court, which does not

have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).[1]

Local Rule 56.1 has a number of requirements that the parties must follow. First, subsection (a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (quoting L.R. 56.1(a)(3)). "The statement . . . shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a).

Second, "[t]he non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (quoting L.R. 56.1(b)(3)(B)). In addition, Local Rule 56.1(b)(3)(C) requires the non-moving party to file "a separate statement . . . of any additional facts that require the denial of summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (citation and internal quotation marks omitted). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C).

Third, "[i]f additional material facts are submitted by the opposing party pursuant to section (b), the moving party may submit a concise reply in the form prescribed in that section for a response." L.R. 56.1(a). "All material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party." *Id.*

When the parties make factual assertions in their briefs, they are required to cite to a Local Rule 56.1 statement, rather than citing "directly to pieces of the record." *Malec v. Sanford*, 191 F.R.D. 581, 586 (N.D. Ill. 2000).

The requirements of Local Rule 56.1 "are not mere formalities," *Zuppardi v. Wal–Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014), and district courts are entitled to "strictly enforce" them, including "by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required."

---

[1] Local Rule 56.1 was recently amended on February 18, 2021. Because the parties' submissions were filed before the amendment, the court analyzes the submissions according to the prior version of the Rule.

2

*Id.*; *see also Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) ("This Court has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1.").

 As with many cases that reach the summary judgment stage, the factual background of this case is complicated. It is made even more complicated by plaintiffs' failure to comply with Local Rule 56.1(b). As discussed in more detail below, plaintiffs frequently deny facts but either fail to cite any record support for the denial, *see, e.g.*, [116] ¶ 52, or cite parts of the record that are nonsequiturs, *see, e.g.*, [116] ¶ 22.[2] *See also, e.g.*, [116] ¶¶ 5, 10, 12, 13, 19, 21, 25, 27, 28, 32, 33, 47, 48, 49, 50, 53. These statements are "deemed admitted" for purposes of summary judgment. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving-party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.").

 Similarly, plaintiffs sometimes present factual assertions that are not supported by a citation at all, *see, e.g.*, [115] at 8–9 (assertions regarding Dr. Charrow's notes), or which rely on factual inferences not reflected in the Local Rule 56.1 statements, *see, e.g.*, [117] at 4–5 (accusations regarding Ms. Moreno, who is mentioned only in passing in Sinai's statement and who is not independently mentioned at all—let alone accused of negligence—in Ortega's statements), or which directly cite the record rather than a Local Rule 56.1 statement, *see, e.g.*, [115] at 2 (citing an exhibit). Each of these types of assertions is improper under Local Rule 56.1. *See Malec*, 191 F.R.D. at 586.

 Although the court, in its discretion, will make reasonable efforts to credit plaintiffs' accurate record citations, the court will not embark on a "hunt[]" for accurate record support when plaintiffs have not cited any such support in their brief or when factual support does not appear in *any* party's Local Rule 56.1 statements. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).

 Finally, the statements in plaintiffs' Local Rule 56.1 Response to the United States' Statement of Facts frequently include additional, nonresponsive information

---

[2] Bracketed numbers refer to docket entries and are followed by the page or paragraph number. Page numbers refer to the CM/ECF page number. Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "US SOF" for the United States' Statement of Facts, [101]; "MS SOF" for Sinai's Statement of Facts, [106]; "PSOF" for Plaintiffs' Statement of Additional Facts in Response to the United States, [116] ¶¶ 71–73; "P's Resp. US SOF" for Plaintiffs' Response to the United States' Statement of Facts, [116] ¶¶ 1–70; "P's Resp. MS SOF" for Plaintiffs' Response to Sinai's Statement of Facts, [118]. All relevant exhibits were appended to the United States' Statement of Facts [101], and are cited as "[101] at [CM/ECF page number]" followed by the exhibit's title.

3

that should have appeared in plaintiffs' separate statement of additional material facts pursuant to Local Rule 56.1(b)(3). *See, e.g.,* [116] ¶¶ 25, 32, 33, 34, 35, 45, 47, 51. If plaintiffs had included this information in their statement of additional facts, as required by the Rule, the United States would have had an opportunity to respond to those assertions. But by improperly placing standalone assertions in their "response," plaintiffs deprived the defendant of a chance to either admit or dispute the new assertions, thereby defeating Rule 56.1's purpose. The court is entitled to "refuse[] to consider any of the[se] new facts" in ruling on a motion for summary judgment. *Eason v. Nolan*, 416 F. App'x 569, 569 (7th Cir. 2011). Nevertheless, the court will—in an exercise of its discretion—attempt to give effect to plaintiffs' new allegations where they are supported by accurate record citations.

## II. Factual and Procedural History

The court views the evidence that complies with Local Rule 56.1 in the light most favorable to the plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005). The following facts are undisputed unless otherwise noted.

On August 7, 2013, plaintiff Amada Ortega, who was slightly over 37 weeks pregnant, went to the obstetrical triage unit at Mount Sinai Hospital, complaining of labor pains. P's Resp. US SOF [116] ¶ 6; US SOF [101] at 198 (Ex. H). The medical providers who treated Ortega included Dr. Lemuel Shaffer and Certified Nurse Midwife Barbara Doran. [116] ¶ 7. Dr. Shaffer and Ms. Doran were employees of Access Community Health Network, a federally funded healthcare provider. [116] ¶ 8.

While Ortega was in labor, the heart rate of her unborn daughter, J.A.O., began to drop. [116] ¶ 9. As a result, Dr. Shaffer performed an emergency C-section to deliver J.A.O. [116] ¶ 10. Dr. Shaffer needed to use a vacuum to complete the C-section. [116] ¶ 10.

Tragically, J.A.O. was born with multiple serious medical conditions, including macrocephaly (a larger-than-normal head), dysmorphic facial features, a limited range of motion, swelling of both hands and feet, decreased muscle tone, absence of muscle reflexes in the legs and arms, and absence of a gag reflex. [116] ¶¶ 11–17.

After being transferred to the Mount Sinai Neonatal Intensive Care Unit (NICU), J.A.O. stopped breathing and needed to be intubated. [101] ¶¶ 20–23.[3]

---

[3] Plaintiffs attempt to dispute this fact by asserting that "J.A.O. was transferred to the NICU 'for grunting, retractions, and poor respiratory effort. Upon arrival to the unit, the baby became apneic and saturations dropped to the low 60s. This was the reason why she was intubated *** and placed on ventilatory support.'" [116] ¶ 21 (quoting [101] at 18

4

While in the NICU, J.A.O. was treated by Dr. Felipe Barrios, the neonatologist who was present during the delivery. [116] ¶ 18. J.A.O. stayed in the NICU for several weeks, where she remained on a ventilator and continued to receive nutrition through an IV. [116] ¶¶ 22, 29.[4] Three attempts to extubate J.A.O. were unsuccessful. [116] ¶ 26.

During her time at Mount Sinai, J.A.O. underwent MRI examinations on August 8 and 26. [101] at 200 (Ex. H). The MRIs indicated small amounts of isolated hemorrhaging, and enlargement of the brain's lateral ventricles. [116] ¶ 24. The MRIs further showed that J.A.O. was born with an "exceedingly small" corpus callosum (part of the brain that connects the left and right cerebral hemispheres), which may represent a congenital brain abnormality. [101] at 200 (Ex. H).

Dr. Barrios considered J.A.O.'s condition to be "serious" and "very atypical." [116] ¶ 19.[5] Dr. Barrios testified that he did not believe that J.A.O.'s condition was caused by an acute (sudden) event at the time of delivery. [116] ¶ 24. Although Dr. Barrios initially considered the possibility that J.A.O.'s breathing troubles might have been caused by an acute event, such as an adverse reaction to general anesthesia, [101] at 36 (Ex. A), he later ruled out this explanation because "respiratory distress and respiratory failure [] resulting from general anesthesia, fluid in the lungs, or an infection" would be "transitory" whereas in J.A.O.'s case the respiratory problems were "persistent" across "three failed attempts at extubation," [101] at 44 (Ex. A). *See also* [116] ¶ 19. In addition, Dr. Barrios testified that J.A.O. presented with several other conditions that clearly were congenital, including macrocephaly and chromosomal abnormalities, [101] at 44–46 (Ex. A), although the detected abnormalities did not have obvious clinical significance

---

(Ex. A)). It is unclear to the court, and plaintiffs do not explain, how the quoted text contradicts the United States' characterization. When a doctor describes a baby as becoming "apneic," that means that the "[b]aby stopped breathing." [101] at 33 (Ex. B). In other words, the quoted language *supports* the United States' assertion that J.A.O. stopped breathing and was intubated after arriving at the NICU. Plaintiffs have not effectively raised a genuine dispute as to this fact.

[4] Plaintiffs attempt to dispute this fact "to the extent that Dr. Barrios testified that he would typically do this"—*i.e.*, treat patients with ventilation and IV nutrition—"in his practice." [116] ¶ 22. But the statement of fact does not argue that this was Dr. Barrios's typical practice, just that it is what happened here. Moreover, the court has reviewed the underlying testimony, which makes clear that Dr. Barrios not only testified that this was his typical practice, but also that this is how he treated J.A.O. Plaintiffs offer no reason to conclude otherwise, and do not argue that J.A.O. was treated in a different manner. Plaintiffs have not effectively raised a genuine dispute as to this fact.

[5] Plaintiffs attempt to dispute this fact by citing other remarks made by Dr. Barrios, but these other remarks do not contradict the quoted text. *See* [116] ¶ 19. Plaintiffs have not effectively raised a genuine dispute as to this fact.

5

(which is to say, there was not a well-established link between these genetic abnormalities and J.A.O.'s physical abnormalities), PSOF [116] ¶ 73. Dr. Barrios also noted that while J.A.O.'s MRI showed isolated "small hemorrhages," he did not believe these hemorrhages were related to any acute injury or event, although he acknowledged that hemorrhaging "could be" caused by birth trauma. [101] at 38–40 (Ex. B) ("There is no evidence for acute ischemic events").

Based on this evidence, Dr. Barrios concluded J.A.O.'s breathing problems and overall condition were caused by a congenital condition. [116] at ¶ 28.[6] Dr. Barrios testified that he thought this congenital condition could have been caused by any number of factors—including chromosomal abnormality, a single-gene defect, or a metabolic disorder—but that he was unable to reach a definitive diagnosis because J.A.O.'s genetic workup was not finished before J.A.O. was transferred to Lurie Children's Hospital on September 17, about a month and a half after she was born. [116] ¶¶ 27, 29.[7]

Once J.A.O. was transferred to Lurie, she was examined by a pediatric neurologist named Dr. Nancy Kuntz. [116] ¶ 30. Dr. Kuntz concluded that J.A.O. had a neuromuscular disorder—also called a myopathy—that was neither curable nor treatable, [116] ¶ 30, and which prevented J.A.O. from using her respiratory (breathing) muscles, [101] at 66–67 (Ex. D).

After discussing J.A.O.'s diagnosis with the Lurie doctors, the plaintiffs decided to extubate J.A.O. and not attempt to resuscitate her, with the understanding that this would likely lead to J.A.O.'s death. [116] ¶ 40. Shortly after being extubated, J.A.O. died on October 19, 2013. [116] ¶ 41.

Three years later, in August 2016, plaintiffs filed this lawsuit. The amended complaint contains five counts: (1) a wrongful death claim against the United States, alleging Dr. Shaffer and Ms. Doran, negligently caused the death of J.A.O.; (2) an Illinois Survival Act claim against the United States, alleging that Dr. Shaffer's and Ms. Doran's negligence caused J.A.O. to experience unnecessary pain and suffering prior to her death; (3) a wrongful death claim against Sinai Health System, alleging that Sinai Health System's agents (including Dr. Shaffer and Ms. Doran) negligently caused J.A.O.'s death; (4) an Illinois Survival Act claim against

---

[6] Plaintiffs attempt to dispute this fact by citing other remarks made by Dr. Barrios, but these other remarks do not contradict the quoted text. Plaintiffs have not effectively raised a genuine dispute as to this fact.

[7] Plaintiffs attempt to dispute Dr. Barrios's testimony by quoting at length other remarks Dr. Barrios made. But these quotations reinforce, rather than contradict, the United States' characterization of that testimony. *See* [116] ¶ 27. Plaintiffs have not effectively raised a genuine dispute as to this fact.

Sinai Health System alleging that Sinai Health System's negligence caused J.A.O. to experience unnecessary pain and suffering prior to her death; and (5) a wrongful death claim against Mount Sinai Hospital Medical Center of Chicago, alleging that that the Medical Center's agents (including Dr. Shaffer and Ms. Doran) negligently caused J.A.O.'s death. [41] at 11–21.

Pursuant to the Federal Tort Claims Act (FTCA), which allows the federal government to be sued for torts committed by its employees, and the Federally Supported Health Centers Assistance Act (FSHCAA), which deems employees of certain federally funded community health centers employees of the federal Public Health Service (i.e., federal employees) for the purposes of the FTCA, the amended complaint names the United States as a defendant in place of Dr. Shaffer and Ms. Doran. [116] ¶ 4; *see also* 42 U.S.C. § 233(g); 28 U.S.C. § 1346(b)(1); *Chronis v. United States*, 932 F.3d 544, 546 n.1 (7th Cir. 2019); *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721 (7th Cir. 2012) ("The [FTCA] makes the federal government liable for acts or omissions by its employees that would be torts in the state in which they occurred had they been committed by someone other than a federal employee."). The United States confirms that both Dr. Shaffer and Ms. Doran were deemed employees of the United States acting within the scope of their employment at the time of J.A.O.'s delivery. [116] ¶ 4. Thus, any claim against Dr. Shaffer and Ms. Doran is considered a tort claim against the United States proceeding under the FTCA.

For several years, the parties conducted extensive discovery and deposed J.A.O.'s physicians, along with other expert medical witnesses. Plaintiffs' theory of the case is that J.A.O.'s condition and death were caused by negligence on the part of her medical providers at the time of delivery. In support of this theory, plaintiffs introduced an expert report and testimony by Dr. Robert Eden, an obstetrician-gynecologist (OB) who specializes in maternal-fetal medicine. Dr. Eden opined that J.A.O.'s providers violated reasonable standards of care during her delivery. Plaintiffs' theory appears to be that the healthcare providers' (including Dr. Shaffer and Ms. Doran) negligence during J.A.O.'s delivery caused J.A.O. to suffer from hypoxic ischemic encephalopathy (HIE), and that HIE injured J.A.O. separate and apart from any preexisting congenital conditions that J.A.O. may have had. [115] at 1–2, 12. The parties did not define HIE, but it is "a condition in which the brain does not receive sufficient oxygen." *Rodas v. Seidlin*, 656 F.3d 610, 613 (7th Cir. 2011); *Fritcher v. Health Care Svc. Corp.*, 301 F.3d 811, 814 n.1 (7th Cir. 2002) ("Hypoxic encephalopathy is permanent and irreversible brain damage caused by an inadequate flow of oxygen to the brain." (citation omitted)).[8]

---

[8] Here and elsewhere in this opinion, the court relies on external sources for the definitions of medical terms, because the parties did not define these terms in the record.

In contrast, the United States' expert witness, Dr. Karin Blakemore—an expert in maternal-fetal medicine and medical genetics—testified "to a reasonable degree of medical certainty" that J.A.O.'s condition was caused by congenital myopathy, [116] ¶¶ 59–60, and that there was "no evidence" to suggest that anything that happened during delivery caused J.A.O.'s outcome, [101] ¶¶ 59–60 & at 200 (Ex. H). Two of the physicians who treated J.A.O., Dr. Kuntz and Dr. Barrios, also testified that J.A.O.'s condition was caused by a congenital defect rather than an acute injury. Specifically, Dr. Kuntz explained that J.A.O. had a myopathy that was neither treatable nor curable and that a myopathy cannot be caused by HIE—two facts that plaintiffs do not dispute. [116] ¶¶ 30–32; *see also* [101] at 66–67 (Ex. D).[9] And Dr. Barrios, as noted above, viewed J.A.O.'s presentation as consistent with a congenital abnormality, rather than any acute neurologic incident at birth. [116] at ¶ 28.

After four years of discovery, both the United States and the Sinai defendants filed motions for summary judgment on all claims against them. *See* [99]; [102]. As part of its motion for summary judgment, the United States moved to exclude the testimony of plaintiffs' expert witness, Dr. Eden. The court first addresses the admissibility of Dr. Eden's testimony and then addresses the two motions for summary judgment.

## ANALYSIS

### I. Admissibility of Dr. Eden's Causation Opinion

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert*." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;

---

[9] Plaintiffs attempt to dispute Dr. Kuntz's testimony on this point "to the extent Dr. Kuntz further testified that" there is no single test that can "rule out" HIE. [116] ¶ 32. But the non-existence of a test to rule out a diagnosis of HIE does not negate Dr. Kuntz's testimony that J.A.O.'s myopathy could not have been caused by HIE. Plaintiffs have not effectively raised a genuine dispute as to this fact.

8

>(c) the testimony is the product of reliable principles and methods; and
>
>(d) the expert has reliably applied the principles and methods to the facts of the case.

Pursuant to this Rule, the court must determine whether the proposed expert testimony is both relevant and reliable before admitting it. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). This requires a three-step analysis. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed. R. Evid. 702). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

Second, the expert's reasoning or methodology must be scientifically reliable. *Ervin*, 492 F.3d at 904. District courts have "broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). *Daubert* set forth the following nonexhaustive factors that may be pertinent in making this determination: "1) 'whether [the expert's theory] can be (and has been) tested'; 2) 'whether the theory or technique has been subjected to peer review and publication'; 3) 'the known or potential rate of error'; and 4) 'general acceptance' among the relevant scientific community." *Smith*, 215 F.3d at 719 (quoting *Daubert*, 509 U.S. at 593–94) (alterations in *Smith*); *see also Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019).

Third, the testimony must be relevant; that is, it must assist the trier of fact in understanding the evidence or determining a fact at issue. *Ervin*, 492 F.3d at 904.

While the district court has broad discretion to act as a "gatekeeper," it must be mindful that "the key to the gate is not the ultimate correctness of the expert's conclusions," but "the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The party offering expert testimony bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702. *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Determinations on admissibility, however, "should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

9

Plaintiffs hired Dr. Eden, an obstetrician-gynecologist (OB) who specializes in maternal-fetal medicine, to provide expert testimony about J.A.O.'s injuries and death. [66]; [101] at 133–136 (Ex. F). In preparing his expert report, Dr. Eden reviewed (1) prenatal records for Amada Ortega; (2) labor and delivery records for Amada Ortega; (3) Mount Sinai NICU records for J.A.O.; (4) Lurie Children's Hospital records for J.A.O.; and (5) the deposition transcripts of Ms. Doran and Dr. Shaffer. *See* [101] at 133 (Ex. F).

Dr. Eden's expert report focuses on two issues. First, the bulk of the report is devoted to arguing that J.A.O.'s medical providers violated the standard of care in several ways, including by: (1) not performing a C-section sooner, (2) administering Pitocin (a drug commonly used to induce labor) to Ortega in an attempt to facilitate vaginal delivery, and (3) not making the C-section incision wide enough, thereby requiring use of a vacuum extractor to fully remove J.A.O. from the womb. [101] at 134–35 (Ex. F). Second, Dr. Eden's report briefly discusses causation. Dr. Eden opines—without further elaboration—that the previously mentioned failures of care "serve as clear causation for any neurologic injury that occurred to [J.A.O.] independent of [J.A.O.'s] genetic abnormality." [101] at 134 (Ex. F); *see also* [101] at 136 (Ex. F) ("I . . . feel comfortable at this time in stating that fetal hypoxia/asphyxia played a significant factor in the neurologic outcome of this child. It is clear that both the genetic and obstetrical violation in standards of care had adverse effects on the neurologic outcome of this child.").

The United States does not challenge Dr. Eden's qualifications. Nor does it challenge the admissibility of Dr. Eden's opinions on whether defendants' medical providers satisfied the applicable *standard of care*. Rather, the United States challenges only the relevance and reliability of Dr. Eden's *causation* opinion. The United States' chief contention is that Dr. Eden's causation opinion is impermissibly contingent and speculative. The Seventh Circuit has held that an expert's testimony on causation is inadmissible under *Daubert* if the opinion amounts to "speculation," subjective belief, or an idiosyncratic hypothesis that is not based on a "recognized scientific method." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019); *see also, e.g.*, *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("[T]he whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions."); *Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 615 (7th Cir. 1993) (opinion inadmissible where it depended on the expert's "personal hypothesis" that was not shared by the scientific community).

Dr. Eden's written report is focused primarily on questions involving the applicable standard of care and says little about causation. Dr. Eden opines in conclusory fashion that: "These violations [of the applicable standard of care] were in no way esoteric: they were clear violations that have been established for at least

10

five decades dating back to the 1960's [*sic*] and can only be viewed as egregious and serve as clear causation for any neurologic injury that occurred to the fetus during labor and delivery independent of the genetic abnormality." [101] at 134 (Ex. F). As detailed below, however, Dr. Eden retracted this opinion during his deposition testimony.

During Dr. Eden's deposition, defense counsel asked Dr. Eden to elaborate on his view of causation. Dr. Eden answered by indicating that his causation opinion was based on the "assum[ption] that [J.A.O.] ha[d] no genetic abnormality." [101] at 142 (Ex. G). Defense counsel asked Dr. Eden to explain why that assumption was important to his causation opinion. Dr. Eden responded that if "the fetus has got a genetic disorder and that it's—it would be going to die anyway. Then that's—it would be hard to separate causation separately. If you want me to assume that there's no genetic issue at all, I can do that." [101] at 142 (Ex. G).

Dr. Eden went on to explain that "if you assume there's no genetic issue," then his view of causation stemmed from "what we call a decreased fetal reserve at the end of labor." [101] at 143 (Ex. G). Dr. Eden explained that "fetal reserve index" is a term created by Dr. Eden that "quantifie[s] or attempt[s] to quantify" whether "the baby . . . ha[s] adequate time to recover after [each] contraction is over." [101] at 143, 156 (Ex. G). Dr. Eden further opined that a decreased fetal reserve can cause "neurologic injury" in the form of "hypoxia,[10] metabolic acidosis,[11] or asphyxia,[12]" or some combination of those factors. [101] at 144 (Ex. G).

Defense counsel asked Dr. Eden if there was evidence that J.A.O. had actually experienced any of these conditions, starting with metabolic acidosis. Dr. Eden admitted that J.A.O.'s umbilical artery gas levels did not meet the clinical "threshold" for a diagnosis of metabolic acidosis according to the standard method used by the "obstetric community." [101] at 144 (Ex. G). Dr. Eden nevertheless opined that the standard metric used by obstetricians "is not correct" and that,

---

[10] *See Tran v. Minnesota Life Ins. Co.*, 922 F.3d 380, 381 (7th Cir. 2019) (defining "cerebral hypoxia" as "brain cell death from deprivation of oxygen"); *Harris v. Clarke*, No. 06-cv-0230, 2008 WL 4866683, at *15 (E.D. Wis. Nov. 10, 2008) ("Hypoxia is defined as an oxygen deficiency in the body tissues.").

[11] *See Jenkins v. Syed*, No. 16-cv-694, 2018 WL 5885941, at *4 (W.D. Wis. Nov. 9, 2018) (defining metabolic acidosis as a condition that occurs when "the chemical balance of acids and bases in the blood is thrown off," and explaining that when metabolic acidosis occurs, "chemical reactions and processes in the body do not work right: respiration rate, heartbeat, cognitive function, digestion and metabolism can all be affected"), *aff'd*, 781 F. App'x 543 (7th Cir. 2019).

[12] *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1453 (5th Cir. 1995) (defining asphyxia as "a word denoting a shortage of oxygen reaching the brain or other bodily tissue").

11

according to Dr. Eden's preferred method, there is evidence that J.A.O. had metabolic acidosis "for a short period of time." [101] at 144 (Ex. G). Dr. Eden also testified that he believed J.A.O. may have suffered from asphyxia because she fell into the "red zone" of Dr. Eden's fetal reserve index, [101] at 145 (Ex. G), although he subsequently conceded that the fetal reserve index is "not something that is today accepted by the ACOG [American College of Obstetricians and Gynecologists] or by the general OB community," [101] at 155–56 (Ex. G). Finally, Dr. Eden stated that his suspicion of hypoxia was supported by the same evidence as his suspicion of metabolic acidosis. [101] at 145–46 (Ex. G).

Defense counsel then asked Dr. Eden to clarify how he believed these conditions (hypoxia, metabolic acidosis, and/or asphyxia) contributed to J.A.O.'s overall injuries and outcome. Dr. Eden replied, "you would have to ask a pediatrician, because I don't know what the combination of any hypoxic injury, in addition to what your diagnosis is [i.e., a myopathy] . . . would lead to." [101] at 148 (Ex. G).

At various points in his deposition, Dr. Eden also raised the possibility that J.A.O. may have experienced "birth trauma" during delivery. [116] ¶¶ 25, 34. It is unclear whether Dr. Eden intended the term "birth trauma" to encompass hypoxia, metabolic acidosis, or asphyxia (or any combination of those three conditions) or whether he instead meant this term to refer to a distinct injury. In either case, when defense counsel asked Dr. Eden whether he was able to "say to a reasonable degree of medical certainty that it is more probably true than not that there was birth trauma in this case," Dr. Eden indicated that he was not. [101] at 185 (Ex. G) ("I wanted to wait until my—the opinion of the genetics came out because that affects my opinion. If you're telling me that this kid is genetically normal, then something has to explain this kid's outcome. If you're telling me that this kid would have had the same outcome based on the genetics, then I am incorrect in my assessment. So I will defer to a geneticist . . . .").

Dr. Eden was also asked whether he could say "to a reasonable degree of medical certainty, that it is more probably true than not that [J.A.O.] suffered an hypoxic ischemic brain injury" (HIE) during delivery. [101] at 189 (Ex. G). Dr. Eden responded that "[w]hether or not the injury [HIE] actually occurred during that time is something we will never know." [101] at 189 (Ex. G). Dr. Eden was later asked to clarify whether "what you're telling us is that for all of the reasons you've indicated, there may have been a brain injury or a contribution to cause a brain injury to [J.A.O.] during delivery, but you cannot say to a reasonable degree of medical certainty that there was, true?" [101] at 190 (Ex. G). Dr. Eden answered, "Without the genetic information, I can't make that assessment." [101] at 190 (Ex. G).

12

Dr. Eden's causation opinion is too speculative to satisfy *Daubert*'s relevance requirement. As noted above, an expert's opinion is relevant only if it assists the trier of fact in evaluating the evidence in the case at hand. *Ervin*, 492 F.3d at 904. Put differently, this requirement means that "the scientific testimony must 'fit' the issue to which the expert is testifying." *Porter*, 9 F.3d at 616; *see also Daubert*, 509 U.S. at 591. Dr. Eden is an OB, not a geneticist or a neuromuscular specialist. He testified that, in order for an OB such as himself to assess causation with "a reasonable degree of medical certainty," he would need "genetic information"—specifically, he would need to know whether J.A.O. "would have had the same outcome based on [her] genetics." [116] ¶ 45; *see also* [101] at 148 (Ex. G) ("I don't know what [injuries] the combination of any hypoxic injury in addition to a [congenital myopathy] would lead to"). By "genetics," Dr. Eden appears to have meant any congenital condition. *See* [116] ¶ 46 (indicating that Dr. Eden has no expertise on how genetics interplays with neuromuscular disorders); *see also* [101] at 147 (Ex. G) (in which Dr. Eden appears to use the terms "genetic" and "congenital" interchangeably). But Dr. Eden could not rule out any genetic or congenital causes of J.A.O.'s injury because—by his own admission—he did not know whether J.A.O. was congenitally or "genetically normal." [116] ¶ 45. Indeed, as discussed above, the undisputed testimony of Drs. Kuntz, Barrios, and Blakemore was that J.A.O. suffered from serious congenital abnormalities. Dr. Eden was therefore left in a position where he could testify only that alleged malpractice might have caused hypoxia, asphyxia, or metabolic acidosis, which in turn "could have" caused J.A.O.'s brain injury and death, but was unable to testify to a reasonable degree of certainty that medical malpractice *did in fact* cause J.A.O.'s injury or death. [116] ¶ 45. As the Seventh Circuit has held, an expert's testimony that a defendant's actions "*can* cause" injury or *could have* caused an injury "is simply too speculative to pass muster under *Daubert*." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 787–88 (7th Cir. 2017). Similarly, an expert's inability to "rule out other causes" is a "proper application of [*Daubert*'s] directive that the [expert's] method 'fit' the factual situation." *Porter*, 9 F.3d at 616. That is the case here.

Nor does Dr. Eden's opinion satisfy *Daubert*'s reliability standard. Even if the court were to assume that temporary hypoxia, asphyxia, or metabolic acidosis are standalone compensable injuries (an argument plaintiffs do not make),[13] Dr. Eden's opinion that J.A.O. experienced these conditions during labor or delivery would not be admissible because Dr. Eden's methodology for diagnosing these conditions is speculative and not "generally accepted in the relevant scientific community." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015).

---

[13] Plaintiffs argue that Dr. Eden testified "that Defendants' failures to meet the standard of care caused hypoxia, metabolic acidosis, birth trauma, and asphyxia, which *caused or significantly contributed* toward J.A.O.'s outcome," [115] at 2 (emphasis added), but plaintiffs do not argue that these conditions are compensable injuries in and of themselves.

13

As discussed above, Dr. Eden admitted that his belief that J.A.O. experienced metabolic acidosis and hypoxia is based on an equation that is at odds with the method generally used by the obstetric community. Dr. Eden further testified that his opinion that J.A.O. likely suffered from asphyxia during labor or delivery is based solely on his "fetal reserve index." [101] at 147. Plaintiffs do not dispute that Dr. Eden's "'fetal reserve index theory' has not been generally accepted in the relevant scientific community." [116] ¶ 52.[14] Nor do plaintiffs explain why the fetal reserve index could be reliable and probative in this specific case despite its lack of general acceptance. Plaintiffs' only response is that Dr. Eden's written report was not based "solely" on the fetal reserve index, noting that his written report does not mention the fetal reserve index. [115] at 9; [116] ¶¶ 51–52. It is true that Dr. Eden's written report does not mention the fetal reserve index, but that is because Dr. Eden's report does not contain *any* explanation of how he arrived at the diagnoses of hypoxia, asphyxia, or metabolic acidosis. *See generally* [101] at 132–36 (Ex. F). The only meaningful description of Dr. Eden's methodology for reaching these diagnoses comes from his deposition testimony. The deposition transcript indicates that Dr. Eden based his diagnosis of asphyxia solely on the fetal reserve index methodology, [101] at 147 (Ex. G), and that he based his diagnoses of metabolic acidosis and hypoxia solely on a nonstandard "extrapolation method," [101] at 144 (Ex. G). Plaintiffs have not shown that these methods are reliable enough to bridge the "analytical gap" at issue here. *Wood*, 807 F.3d at 836.

Because Dr. Eden's testimony regarding causation is neither relevant nor reliable, the court grants the United States' motion to exclude this testimony under *Daubert*.

## II.  Defendants' Motions for Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The Supreme Court instructs that Rule 56 'mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018) (quoting *Celotex*, 477 U.S. at 322). In other words, to resolve this motion for summary judgement, the court "must determine what it is that [plaintiffs] would be required to prove at trial," *Austin*, 885 F.3d at 1088, and ask whether "a reasonable jury" could find that they have met their burden of proof,

---

[14] Plaintiffs attempt to dispute this statement "to the extent that this statement implies that Dr. Eden relied solely on the fetal reserve index in coming to his conclusions in this case." [116] ¶ 52. This is a non-sequitur, and in any event is not supported by any citations to the underlying record. Plaintiffs have not effectively raised a genuine dispute as to this fact.

14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law—here, Illinois state law—controls which facts the plaintiff would have to prove at trial. *Austin*, 885 F.3d at 1088; *see* 28 U.S.C. § 1346(b)(1) (predicating FTCA liability "in accordance with the law of the place where the act or omission occurred").

In adjudicating a motion for summary judgment, the court gives the non-moving party "the benefit of reasonable inferences from the evidence, . . . but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted); *cf. Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 232 (1990) ("A fundamental principle of tort law is that the plaintiff has the burden of proving by a preponderance of the evidence that the defendant caused the complained-of harm or injury; mere conjecture or speculation is insufficient proof."). "Speculation does not defeat summary judgment," *Austin*, 885 F.3d at 1089, and the "mere 'metaphysical possibility'" that defendant is liable "is not enough to create a material issue of fact," *Jacobs v. University of Wisconsin Hosp. & Clinics Auth.*, 12 F. App'x 386, 390 (7th Cir. 2001) (quoting *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1091 (7th Cir.2000)).

### A. The United States' Motion for Summary Judgment

To prevail on claims alleging medical malpractice—as all of plaintiffs' claims do—a plaintiff must prove: (a) "the proper standard of care by which to measure the defendants' conduct"; (b) "a negligent breach of the standard of care"; and (c) "the resulting injury was proximately caused by the defendants' lack of skill or care." *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 621 (1st Dist. 2007). Expert testimony is required to prove breach and proximate cause, except in a handful of circumstances not at issue here. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill.2d 278, 296 (2000). An expert's testimony on proximate cause is insufficient as a matter of law if his testimony is "contingent, speculative or merely possible." *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 549 (1st Dist. 2005). "[W]here the expert's opinion is the only evidence of proximate cause he must base his opinion on a reasonable degree of medical certainty." *Scholle v. Continental Nat'l Am. Grp.*, 44 Ill. App. 3d 716, 721 (2d Dist. 1976).

There is a genuine factual dispute about the proper standard of medical care and about whether J.A.O.'s medical providers satisfied that standard. Dr. Eden has testified that they did not. He believes, for example, that Ortega should have been given a C-section right away, that doctors should never have attempted to induce vaginal labor, and that the C-section incision was too wide. Defense expert Dr. Blakemore testified the opposite. In her view, the medical providers reasonably anticipated that Ortega, a healthy woman with two past successful vaginal deliveries, was a good candidate for a third vaginal delivery. In Dr. Blakemore's opinion, the use of Pitocin to induce labor was standard and well justified, and the timing and technique used for Ortega's C-section were clinically appropriate. As

15

defendants concede, [100] at 3, this is a classic example of a factual dispute that is properly reserved for trial. Plaintiffs have put forward enough admissible evidence to allow a reasonable trier of fact to find in their favor.[15]

But plaintiffs have not put forward admissible evidence on the third element of their claims: causation. Plaintiffs' only evidence that medical negligence could have caused J.A.O.'s injuries comes from Dr. Eden's expert testimony, and Dr. Eden's causation opinion is inadmissible under Rule 702 and *Daubert*, as explained above. Without this opinion, plaintiffs cannot meet their burden of demonstrating that defendants proximately caused J.A.O.'s injuries. *Jones*, 191 Ill.2d at 296.

Even if the court were to consider Dr. Eden's causation opinion, that opinion is too speculative and attenuated to meet plaintiffs' burden of proof. "Under Illinois law, to serve as the sole basis for a conclusion that an act was the proximate cause of the plaintiff's injury, an expert must be able to testify with a reasonable degree of medical certainty that proximate cause existed." *Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997) (citing *Scholle*, 44 Ill. App. 3d at 721). Here, Dr. Eden's causation opinion is plaintiffs' only support for proximate cause and, as discussed above, Dr. Eden did not testify with reasonable certainty that medical negligence caused J.A.O.'s condition. Thus, plaintiffs' claims against the United States cannot proceed past summary judgment.

Plaintiffs argue that the court should treat Dr. Eden's opinion as being reasonably certain because "the evidence of an alternative cause d[oes] not exist or [is] inconclusive." [115] at 6. Plaintiffs emphasize that the geneticist at Lurie Children's Hospital, Dr. Charrow, could not definitively link any of J.A.O.'s known chromosomal abnormalities to her neurologic condition, and that the brain MRI taken at Mount Sinai showed small hemorrhaging and "enlargement of the lateral ventricles suggesting the possibility that brain parenchymal injury may have contributed to J.A.O.'s" decreased muscle tone. [115] at 6. Plaintiffs also point out that Dr. Kuntz "never ruled out [HIE] as a possible diagnosis," and in fact admitted that some of J.A.O.'s symptoms "were consistent with [HIE]." [115] at 8. Plaintiffs further argue that defendants should have conducted a cord gas analysis in addition to an umbilical-artery gas analysis, and hypothesize that the results of such an analysis might have provided evidence of an acute injury. [115] at 10–11.

These arguments do not defeat summary judgment. Even if the MRI, gas analysis, and genetics studies do not definitively "rule out" the possibility of an acute injury, it is still "incumbent on the [plaintiffs], as the party with the burden of proof, to come forward with convincing affirmative evidence" that defendants'

---

[15] Plaintiffs' brief references "a jury" multiple times. [115] at 4, 9. However, jury trials are not available against the United States in FTCA cases, such as this one. 28 U.S.C. § 2402. If this case were to proceed to trial, the fact finder would be the court, not a jury.

16

actions caused J.A.O.'s condition "in order to survive summary judgment." *Wintz*, 110 F.3d at 515; *see also Porter*, 9 F.3d at 615. Plaintiffs have not done so. The most they have done is shown that defendants' actions *could have* caused an acute injury, which in turn *could have* changed the trajectory of J.A.O.'s overall condition for the worse. But evidence of mere "possibility" is not enough to survive summary judgment. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1091 (7th Cir. 2000), *rev'd on other grounds by Ortiz v. Werner Enter., Inc.*, 834 F.3d 760 (7th Cir. 2016) (circulated and adopted without rehearing en banc pursuant to 7th Cir. R. 40(e)); *see also Joyce v. JC Penney Corp.*, 389 F. App'x 529, 531 (7th Cir. 2010) ("speculation about causation will not defeat summary judgment" even where doctors are "unwilling to rule out the possibility" that defendant's actions contributed to the plaintiff's injuries); *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) ("we have consistently held that summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit." (citation and internal quotation marks omitted)).

At times, plaintiffs appear to argue that if J.A.O.'s doctors could not identify the specific genetic defect responsible for J.A.O.'s neurologic condition, then it *must* be the case that her condition was caused by an acute injury. *See* [115] at 8 ("Defendants' experts . . . were unable to specifically diagnose a genetic or congenital myopathic cause for J.A.O.'s symptoms."). Dr. Eden made a similar comment during his deposition. *See* [116] ¶ 45 ("If you're telling me that this kid is genetically normal, then something has to explain this kid's outcome."). But Dr. Eden is not a genetics expert. [116] ¶ 46. And the only genetics expert to testify in this case, Dr. Blakemore, testified without contradiction that J.A.O.'s neurologic condition and death *were* caused by a congenital myopathy. [116] ¶ 60. Dr. Blakemore further testified—again, without contradiction—that it is common for genetic tests, particularly the limited forms of genetic testing that were available in 2013, to not reveal "the exact etiology" of a congenital myopathy. [101] at 203 (Ex. H). Nevertheless, both Dr. Blakemore and every member of J.A.O.'s care teams at Sinai and Lurie concluded that J.A.O. had a congenital myopathy. [116] at ¶ 60; [101] at 200 (Ex. H). In light of this unrebutted evidence, no reasonable trier of fact could determine that defendants' failure to isolate a specific genetic defect makes it more likely than not that J.A.O.'s condition was caused by an acute injury attributable to defendants' negligence.

Finally, plaintiffs emphasize that medical malpractice can cause a patient with a preexisting congenital disorder to experience a negative change in the overall "trajectory" of her condition. [115] at 7. This is true in the abstract, but plaintiffs have not put forward any evidence that this is what happened here. As noted above, Dr. Eden was unable to testify with reasonable certainty that defendants' actions actually *did* exacerbate J.A.O.'s congenital condition, or even what the possible effects of an acute injury in addition to J.A.O.'s congenital condition might have been. *See* [101] at 148 (Ex. G) ("I don't know what the combination of any

17

hypoxic injury, in addition to your diagnosis"—that is, a diagnosis that J.A.O. had "a myopathy"—"would lead to."). The most Dr. Eden could testify is that, in his opinion, there is an open "question that has to be assessed" regarding whether J.A.O. sustained an acute injury that interacted with "the genetic issue that is involving [*sic*] with this kid" in a way that impacted her survival. [101] at 149 (Ex. G). But at summary judgment, plaintiffs must do more than point to open questions or abstract possibilities; they must put forward affirmative evidence from which a reasonable fact finder could determine that defendants did in fact cause the injuries listed in their complaint. *Steen*, 486 F.3d at 1022. Plaintiffs have not done so. The United States' motion for summary judgment is granted.

### B. The Sinai Defendants' Motion for Summary Judgment

Plaintiffs' claims against the Sinai defendants are based on the theory that some of J.A.O.'s medical providers—including Dr. Shaffer and Ms. Doran—were agents of Sinai, and that Sinai is therefore vicariously liable for those providers' negligence. *See* [117] at 1; *see also Gilbert v. Sycamore Mun. Hosp.*, 156 Ill.2d 511, 519 (1993) (to hold a hospital vicariously liable for a provider's negligence, plaintiffs must prove that the providers were actual or apparent agents of the hospital).

Summary judgment is warranted in favor of the Sinai defendants for the same reason it is warranted against the United States: there is no evidence in the record that would allow a reasonable trier of fact to conclude that anything the healthcare providers did during labor or delivery caused J.A.O.'s neurological condition or death.

The Sinai defendants are also entitled to summary judgment for the additional reason that Sinai bears no vicarious liability under Illinois law for the alleged negligence of the healthcare providers who treated J.A.O. As discussed above, plaintiffs' complaint names only two healthcare providers who allegedly were negligent in treating J.A.O.: Dr. Shaffer and Ms. Doran. The complaint alleges that Dr. Shaffer and Ms. Doran were "agents" of Sinai, [41] ¶ 14, but it is undisputed that Dr. Shaffer and Ms. Doran were deemed to be employed by the federal government, not by Sinai. And it is undisputed that Dr. Shaffer and Ms. Doran were acting within the scope of employment during J.A.O.'s delivery.

The FSHCAA provides that the FTCA is the "exclusive" remedy for negligence suits against individuals deemed employees of the Public Health Service (i.e., federal employees) for injuries caused within the scope of employment. 42 U.S.C. § 233(a); *Mann v. Harvey*, 999 F. Supp. 2d 1087, 1091 (N.D. Ill. 2013) ("pursuant to 42 U.S.C. § 233(a), a suit against the government under the FTCA is the exclusive remedy for a claim against a member of the Public Health Service (PHS) involving the performance of medical or related functions within the scope of the PHS member's employment" (citing *Hui v. Castaneda*, 559 U.S. 799 (2013))). Thus, the only proper defendant for alleged malpractice by Dr. Shaffer and Ms.

Doran is the United States, not the Sinai defendants. *See Riley v. United States*, No. 18-cv-4810, 2019 WL 4062543, at *2 (N.D. Ill. Aug. 28, 2019). When Sinai pointed out this obstacle in its motion for summary judgment, [103] at 7–10, plaintiffs silently abandoned any claims against Sinai related to Dr. Shaffer and Ms. Doran, *see* [123]. Accordingly, plaintiffs waived any counterargument they might have had on this point. *See Webb v. Frawley*, 906 F.3d 569, 582 (7th Cir. 2018). Sinai cannot be vicariously liable for the actions of Dr. Shaffer or Ms. Doran.

Plaintiffs also allege in their amended complaint that Sinai is vicariously liable for negligence committed by its other "agents," without specifying who those other agents might be or how they were negligent. In their opposition brief, plaintiffs allege for the first time that their reference to Sinai's other "agents" should be understood as a reference to Socorro Moreno, a registered nurse and Sinai employee who treated J.A.O. alongside Dr. Shaffer and Ms. Doran. Plaintiffs' arguments regarding Ms. Moreno are unsupported by any of the Local Rule 56.1 statements, which mention Ms. Moreno only in passing. *See* P's Resp. MS SOF [118] ¶ 62 (noting that Ms. Moreno attended to Ortega on August 7, 2013); [118] ¶¶ 70–72 (noting that Ms. Moreno wrote notes indicating that Ms. Doran restarted and then stopped Ortega's Pitocin). These arguments are therefore disregarded for purposes of summary judgment.

Even if the court were to credit plaintiffs' allegations regarding Ms. Moreno, plaintiffs' claims against Sinai would still fail, because there is no evidence in the record that Ms. Moreno was responsible for any of the medical decisions about which plaintiffs complain. Plaintiffs argue in their brief that *Ms. Doran* acted negligently when she administered Pitocin "after the artificial rupture of [Ortega's] membranes," [117] at 5, but it is undisputed that this decision was made by Ms. Doran, not by Ms. Moreno, *see* [118] ¶¶ 70–72. And while plaintiffs theorize that Ms. Moreno had a duty to attempt to talk Dr. Shaffer and Ms. Doran out of restarting Pitocin, they cite no legal support for this argument. [117] at 6–7. Moreover, plaintiffs contend that Ms. Moreno did not adequately "communicate with Dr. Shaffer" regarding Pitocin, but this is speculation. There is no evidence in the record on this point one way or the other, presumably because plaintiffs never deposed Ms. Moreno (and, as far as the court can tell, did not attempt to depose Dr. Shaffer or Ms. Doran about Ms. Moreno's communications with them). The absence of affirmative evidence on this point defeats plaintiffs' claim. Sinai is entitled to summary judgment.

## CONCLUSION

What happened in this case was tragic. The court has no doubt that plaintiffs' loss of their infant daughter has devastated plaintiffs and will impact them and their family members for the rest of their lives. The court cannot conclude, however, that the record would allow a reasonable jury to conclude that

19

defendants were responsible for this tragedy. Defendants' motions for summary judgment are therefore granted.

Date: September 30, 2021                    /s/ Martha M. Pacold